**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 190185-U

Order filed March 24, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| JUAN JAIME, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| SHABBIR NOMANBHOY, as Trustee of the | ) | |
| Nomanbhoy 2007 Children's Trust for the | ) | |
| Benefit of Insiyah Nomanbhoy and Sarah | ) | |
| Nomanbhoy, | ) | |
| | ) | |
| Defendant/Counterplaintiff-Appellee, | ) | Appeal No. 3-19-0185 |
| | ) | Circuit No. 15-CH-1741 |
| v. | ) | |
| | ) | |
| JUAN JAIME, THREE BROTHERS | ) | |
| INVESTMENTS, LLC, LA HACIENDA | ) | |
| DE LAS AMERICAS, INC., and | ) | |
| SUPERMERCADO DE LA HACIENDA, INC., | ) | |
| | ) | |
| Counterdefendants | ) | |
| | ) | The Honorable |
| (Juan Jaime and Three Brothers Investments, | ) | John C. Anderson, |
| LLC, Counterdefendants-Appellants). | ) | Judge, Presiding. |

JUSTICE PETERSON[1] delivered the judgment of the court.
Justices McDade and Brennan concurred in the judgment.

_____

[1] This case was administratively reassigned to Justice Peterson for authorship on December 19, 2022. Justice Peterson has read the briefs and listened to the recording of the oral argument.

**ORDER**

¶ 1      Held:    The circuit court did not err in denying plaintiff's request to rescind the parties' sales agreement for a shopping center where the agreement was valid. The circuit court also did not err in denying plaintiff's request, in the alternative, for specific performance of the parties' option agreement that provided plaintiff an option to repurchase the shopping center from defendant where plaintiff was in breach of the option agreement, thereby terminating the option. The circuit court findings in favor of defendant on defendant's counterclaim for a declaratory judgment, breach of contract, fraud, and breach of fiduciary duty were not against the manifest weight of the evidence. However, the circuit court's award of damages was erroneous.

¶ 2      Plaintiff/counterdefendant (plaintiff), Juan Jaime, filed an amended complaint to rescind the parties' sales agreement or, alternatively, for specific performance of the parties' option agreement for plaintiff to buy back property from defendant/counter plaintiff-appellee (defendant), Shabbir Nomanbhoy. Defendant filed a second amended counterclaim requesting a declaratory judgment that plaintiff had breached the option agreement and seeking damages related to plaintiff's alleged breach of contract, fraud, and breach of fiduciary duty. The circuit court found in favor of defendant and against plaintiff on both plaintiff's amended complaint and defendant's second amended counterclaim, awarding damages in favor of defendant. Upon plaintiff's motion to reconsider, the circuit court modified its original damage award. Plaintiff appeals, arguing the circuit court erred in: (1) failing to rescind the parties' sales agreement; (2) failing to order specific performance under the parties' original option agreement; (3) failing to order specific performance under the parties' option agreement, as modified by a subsequent addendum; (4) finding in favor of defendant and against plaintiff on defendant's second amended counterclaim; and (5) assessing damages in the amount awarded. We affirm in part, vacate the circuit court's award of damages, and remand for the circuit court to recalculate its award of damages.

2

## I. BACKGROUND

In 2006, plaintiff was provided financing to develop a 17,700 square foot multi-unit shopping center in Joliet, Illinois (property). Thereafter, plaintiff transferred ownership of the property to his corporation, Three Brothers Investments, LLC (Three Brothers).[2] Plaintiff, eventually refinanced with First Midwest Bank and personally guaranteed the refinanced commercial mortgage. Plaintiff fell behind on his payments and a judgment of foreclosure was entered on April 22, 2014, with a foreclosure sale set for June 19, 2014. First Midwest Bank was willing to allow a buyout of the loan at a reduced amount (a short sale of the property) as long as the transaction closed prior to the foreclosure sale.

On April 14, 2014, through a mutual contact, defendant learned of plaintiff's search for new financing to resolve the foreclosure suit that had been filed against plaintiff, plaintiff's wife, and Three Brothers. Defendant requested information regarding the property's leases, appraisals, liens, and taxes. Under the terms of the leases, tenants were required to pay a percentage of common area maintenance, insurance, and real estate taxes ("additional rent") in addition to their monthly base rent. The appraised value of the property at that time was approximately $1.2 million.

In reviewing the leases, defendant learned that two businesses owned by plaintiff were tenants of the property—Supermercado de La Hacienda, Inc. (Supermercado) and a banquet hall, La Hacienda de Las Americas, Inc. (La Hacienda). The leases for those two tenants, each occupying 5000 square feet of the property, indicated a reduced rental rate when compared to the rental rate for the other tenants. Defendant sent plaintiff a proposal to purchase the property out

---

[2] Plaintiff and his wife, Maria Jaime, each owned 50% of Three Brothers.

of foreclosure, with an option for plaintiff to purchase the property back from defendant at a later point in time. Additionally, defendant lived in California and intended to have plaintiff manage and maintain the property.

¶ 7        On May 26, 2014, the parties executed a sales agreement for the sale of the shopping center to defendant for $850,000 (the amount the bank would accept for a short sale of the property). On the same day, the parties also executed the option agreement and new leases for Supermercado and La Hacienda. Additionally, Three Brothers assigned defendant the remaining leases for the shopping center.

¶ 8                              A. Option Agreement

¶ 9        Pursuant to the parties' option agreement, plaintiff paid defendant a nonrefundable $50,000 option fee in consideration for plaintiff having the ability to buy back the property for $1,242,700 (at least 12 months after the defendant purchased the property), with the $50,000 option fee to be applied to the purchase price. The option period was to be from June 1, 2015, through August 31, 2015, plaintiff to close no later than August 31, 2015. If plaintiff failed to close by August 31, 2015, with the failure to close not due to defendant's delay, the option "shall terminate." If the failure to close was caused, in part, by defendant, then plaintiff "shall close at such time that [defendant] is able" but not later than September 30, 2015. Plaintiff was required to give written notice of his intent to exercise the option "at least six months prior to the anticipated closing date," with the last date to give notice being February 28, 2015, (and as early as December 1, 2014).

¶ 10       Additionally, under the option agreement, in the event of a claimed default and resulting litigation, "each party shall pay for his own attorney fees." The option also specified that plaintiff agreed "to be solely responsible for the routine maintenance of the property" through the sale of

4

the property or the termination of the option, with any repair exceeding $1000 to be defendant's responsibility and the amount of such repair added to the option purchase price. Plaintiff was also to be responsible "for any and all security deposits currently held on the premises," and was to promptly return to any tenant their security deposit upon the tenant vacating the premises (minus any amount retained for damages).

¶ 11 Plaintiff signed the parties' option agreement as Juan Jaime, with no reference to Three Brothers. The related warranty deed for the property was conveyed by Three Brothers to defendant, with the signature line indicating Three Brothers and both plaintiff and his wife signing their names as manager.

¶ 12 B. Supermercado/La Hacienda Leases and Lease Addendum #1

¶ 13 On May 26, 2014, the parties also executed new leases for plaintiff's businesses, Supermercado and La Hacienda, which specified that defendant was the landlord and Supermercado and La Hacienda, on their respective leases, were the tenant. The term of the leases was from June 1, 2014, until August 31, 2015 (the last date for closing on the sale of the property back to plaintiff under the option). The base rent for each lease was $2000, with a 3% increase each year. Under the leases, the tenant agreed to pay additional rent on a monthly basis, with the landlord notifying the tenant of the "approximate costs for the services to be provided by the landlord for the facility which shall include but not be limited to: insurance (including liability insurance), shrub and lawn care and snow removal, pest control, common area overhead and maintenance, parking lot maintenance." The tenant agreed to be responsible for 21% of that amount, with 1/12 paid by the tenant monthly as additional rent. Additionally, "during the term of th[e] lease," the tenant "shall pay as additional rent" 21% of the real estate taxes for the shopping center, with an adjustment to be made for the monthly payments based upon the latest

5

assessment information with an adjustment to be made upon receipt of the actual tax bills. Any additional increases were to be "spread over the remaining monthly payments due under th[e] Lease."

¶ 14   Under the leases, the tenants were prohibited from assigning or subletting the premises without first obtaining written consent of the landlord, and the landlord agreed not to unreasonably withhold its consent to any proposed assignment or sublease. Under the leases' holdover provisions, in the event a tenant was to hold over the premises after the expiration of the indicated term with the consent of the landlord, the tenancy was to be construed as month-to-month, subject to the lease terms and, unless a new rental had been negotiated with the landlord, the tenant was to pay 1.5 times the monthly rent and other charges provided for by the lease for such additional time as the tenant held the premises after expiration of the lease.

¶ 15   In executing the leases for the tenant, the leases were signed by plaintiff as Juan Jaime on the signature line for Supermercado and La Hacienda, respectively. On that same day, May 26, 2014, the parties also executed an addendum to the Supermercado and La Hacienda leases (Addendum #1). The addendums specified the lessees (Supermercado and La Hacienda, respectively) were affiliated with Three Brothers and Juan Jaime and that Three Brothers and Juan Jaime had entered into both a sales agreement and an option to repurchase real estate with defendant. The addendum also indicated that the parties acknowledged that the rental amount listed on the leases was below fair market value and that "in consideration of the reduced rent" and other consideration as set forth in the "parties' agreements," the lessee agreed that for the term of this Lease the Lessee shall provide certain services related to the management of the property—landscaping, snow and ice removal, cleaning the parking lot and common areas, pay for common area utility bills, maintain the elevator and common area equipment, pay for repairs

6

under $1000, assist in rent collection, deposit checks given to lessee by renters into defendant's account within one business day (checks were to be made payable to defendant or returned to renters to be corrected), and repay deposits held by "him" from each current renter upon termination of their lease. Addendum #1 also prohibited the assignment of the lease for any reason, including but not limited to the sale of the business and, if a new entity sought to occupy the premises, "a new lease at fair market rent shall be required."

¶ 16                                  C. The Parties' Actions after May 26, 2014

¶ 17         After the closing, defendant charged additional rent to tenants based on their respective square footage (rather than the 21% of the total expenses as indicated in the leases), contending that a flat rate of 21% would have resulted in an unnecessary surplus. For plaintiff, this was 28% of the total expenses for each of his businesses (56% for both businesses). In an email of June 17, 2014, plaintiff's attorney informed defendant that plaintiff had not previously required tenants to pay additional rent and plaintiff was not agreeing to pay any additional rent. Plaintiff did not pay additional rent for Supermercado and La Hacienda and told other tenants not to pay the full amount of additional rent charged by defendant. At the end of June 2014, one tenant, GoMobile broke its lease and vacated the premises. Plaintiff failed to turn over the GoMobile security deposit to defendant. In mid-July 2014, due to the failure to pay additional rent, defendant sent Supermercado and La Hacienda eviction notices.

¶ 18         In June 2014, unbeknownst to defendant, plaintiff had begun leasing the La Hacienda space out to Jose Jasso for $6000 per month, with a three-year lease term of June 15, 2014, to June 14, 2017. The lease indicated that La Hacienda was the landlord, Jasso was the tenant, and monthly rent was to be made payable to Juan Jaime." In executing the lease with Jasso, the

7

signature line listed "LANDLORD: La Hacienda De Las Americas, Inc." and was signed by Juan Jaime as manager.

¶ 19    On August 1, 2014, also unbeknownst to defendant, plaintiff began renting out the Supermercado space to Ali Shalash for $4000 per month after Shalash purchased the Supermercado grocery business from plaintiff and his wife on July 28, 2014. The lease for the space was between Three Brothers, as the landlord, and Supermercado La Hacienda of Joliet, Inc. (the name of Shalash's corporation) as the tenant, with a five-year lease term of August 1, 2014, to July 31, 2019. The lease was executed on July 28, 2014, and plaintiff signed it as the landlord "by: Juan Jaime."

¶ 20    On September 8, 2014, after negotiating toward a resolution of the additional rent issue and not knowing of plaintiff's subleases, defendant proposed an addendum to the option agreement and second addendums to the Supermercado and La Hacienda leases (collectively, the September addendum). At that time, defendant also informed plaintiff that plaintiff was in breach of the option agreement for failing to turn over the GoMobile security deposit.

¶ 21                          D. September Addendums

¶ 22                          i. Lease Addendum #2

¶ 23    On September 12, 2014, the parties executed lease addendum #2 (Addendum #2) to both the Supermercado and La Hacienda leases, indicating the lease addendums were made part of those leases. Under Addendum #2, the parties indicated that the lessee (Supermercado and La Hacienda, respectively) was affiliated with Three Brothers and "Juan Jaime, an individual." The parties acknowledged that Three Brothers and Juan Jaime had entered into a sales agreement and an option agreement, both dated May 26, 2014, with defendant.

8

¶ 24    Under Addendum #2, the lessor and lessee agreed, in part, that the shopping center had 18,000 square feet of rentable space and the tenant[s] each occupied 5000 square feet, which was approximately 28% of the total rental space and, during the term of the lease, the tenants were each to pay additional rent on a monthly basis in the amount of 28% of the total annual cost of insurance for the shopping plaza and of the current year property tax bill for the shopping center (2014 tax bill was to be estimated the same as the previous year's 2013 tax bill). Addendum #2 also indicated that 1/12th of the two tax bills and the annual cost of insurance was to be paid on the 1st of each month, with the amount of additional rent currently estimated as $1600 per month. Late charges would be applied if rent or any sum due was not received by the landlord within five days after the amount was due. Addendum #2 also indicated, "Lessee shall pay directly to Lessor, all deposits being held by Lessee from each of the tenants" upon the termination of such lease or within 10 days of termination, abandonment, or early termination.

¶ 25    Under Addendum #2, the parties further agreed that, "[l]essee shall act as Manager of the Shopping Plaza and communicate promptly with Lessor about any problems or opportunities with other tenants or potential tenants in the Shopping Plaza." Additionally, the parties agreed that "[a]ny default" of the terms of the lease, lease addendum #1, or lease addendum #2, "will act to automatically terminate the Option." Plaintiff signed the option addendum as Juan Jaime, with no reference to any business entity.

¶ 26                    ii. Option Addendum

¶ 27    On September 12, 2014, plaintiff also executed an addendum to the option agreement, which indicated that it was being made part of the parties' option agreement. Under the option addendum, the parties acknowledged defendant and plaintiff had entered into a sales contract and an option agreement, and that "plaintiff, through other entities owned by him," had entered into

9

two leases with defendant and addendums to those leases on May 26, 2014 (Addendum #1), and on September 12, 2014 (Addendum #2).

¶ 28    Under the option addendum, plaintiff acknowledge that he, "Juan Jaime," had two lease agreements under the entities La Hacienda and Supermercado and that plaintiff "Juan Jaime" was the principal of both those entities. The parties also agreed that plaintiff was the principle of Three Brothers and that both plaintiff and Three Brothers were affiliated with La Hacienda and Supermercado. The parties agreed that a default of any terms of the leases, the option, or the addendum, "will act to automatically terminate the [o]ption." Additionally, plaintiff was to pay directly to defendant all deposits being held by plaintiff from other tenants within 10 days of the termination of their leases (or within 10 days of abandonment or early termination).

¶ 29    Specific to the parties' additional rent dispute, item 4 of the option addendum provided:

"(a) Jaime has not paid additional rent for the months of June, July, and August 2014, and the amount outstanding is $10,230.

(b) Jaime also has a balance due of $210 for additional rent for September.

(c) Jaime will pay [defendant] $500 to cover 50% of attorney costs incurred by [defendant] in this dispute so far.

(d) These amounts [totaling $10,940] may be paid on or before Oct. 1, 2014, without any penalty or interest. If paid after Oct. 1, 2014, the amount will be multiplied by a factor of 1.462 for a total of $15,994.28 to be paid.

(e) Jaime owed [defendant] $2300 for the security deposit [for Go Mobile] *** and this amount shall be paid no later than Oct. 1, 2104. Failure to pay this $2300 security deposit to [defendant] by Oct. 1, 2014, shall be a default of the Option.

10

(f) If any additional rent for taxes/insurance is not paid by any other tenants of the Shopping Plaza as required by their lease, that unpaid amount of additional rent shall be added to the purchase price under para[graph] 4 of the Option. No interest or penalty is to be paid by Jaime on this additional rent due from other tenants.

(g) When Jaime gives notice to exercise the Option, and if Jaime has not already paid the $10,940 by Oct 1st in item 4d above, Jaime shall pay [defendant] $15,994.28, plus any unpaid additional rent due from the other tenants without penalty or interest, at the time of giving notice. If Jaime fails to give notice to exercise the Option, Jaime shall pay $15,994.28, plus any unpaid additional rents by other tenants without penalty or interest, no later than June 30, 2015."

¶ 30    The option addendum also indicated any changes to the addendum, option, or leases, "shall be in writing signed by both Jaime and [defendant]" and that "no reliance shall be made on emails or verbal discussions in case of any dispute." Plaintiff acknowledged that he had the opportunity to review the option addendum with his attorney and have it explained by an interpreter and agreed "not to use a defense of not understanding any portion of this [a]ddendum, or any other documents signed by him on the event date, or on May 26, 2014, in case of further disputes between [the parties]." Plaintiff signed the option addendum as Juan Jaime, with no reference to any business entity.

¶ 31                    E. Parties' Actions after September 12, 2014

¶ 32    It appears from the record that on or about December 23, 2014, plaintiff first attempted to provide notice to defendant of his intent to exercise the option via email. On December 25, 2014, defendant indicated that he would accept plaintiff's notice when plaintiff paid $12,310, which

11

included $7310 of an unpaid balance under item 4 of the option addendum (based on a prior partial payment by plaintiff) plus $5000 unpaid additional rent on behalf of the other tenants. On January 28, 2015, plaintiff paid $12,310 to defendant, but defendant requested an additional $7690, contending that additional amounts had become due. It appears that defendant subsequently indicated the amount to exercise the option was $6273.85 if plaintiff also paid $10,650 in lost rent from the vacated GoMobile unit, otherwise plaintiff was to pay $9018.23. On February 20, 2015, plaintiff deposited $1098.25 in defendant's account, disputing the remaining amount requested by defendant. On February 25, 2015, plaintiff's attorney sent defendant written notice of plaintiff's intent to exercise the option, indicating that plaintiff had paid all sums due to exercise the option.

¶ 33                                    F. Litigation

¶ 34        On August 13, 2015, plaintiff filed a complaint initiating this lawsuit, requesting specific performance of the option agreement. Plaintiff subsequently filed the amended complaint, as is discussed below. On September 25, 2015, plaintiff filed a motion to abate rent and for other temporary relief, seeking to enforce the option agreement and contending that after September 30, 2015, (the last date defendant was required to close on the option), he would be the equitable owner of the property and was entitled to "all rental amounts thereafter." Plaintiff requested to maintain the status quo until there was a resolution of his request for specific performance. On October 15, 2015, defendant filed a motion for summary judgment, arguing that even though there was a dispute regarding the amount of additional rent to be paid for plaintiff to exercise the option, plaintiff's payment was insufficient even when using plaintiff's own figures.

¶ 35 On October 15, 2015, the circuit court entered an order indicating that "until further order of the court all leases for the subject property shall remain in effect at the rates stated therein." On December 17, 2015, the circuit court entered a written order indicating that "[b]y agreement no existing lease shall be altered or cancelled without good cause shown and with order of court or by reasonable agreement of the parties." The circuit court also denied defendant's motion for summary judgment because "a material issue of fact exists between the litigants" and denied plaintiff's motion to abate rent and for other temporary relief without prejudice.

¶ 36 In February 2016, during the pendency of this case, plaintiff executed another sublease with another third party, Amber Duffy, for the La Hacienda space, charging her a base rent of $6500 per month. The lease was between La Hacienda De Las Americas, Inc. as landlord and Duffy's LLC as the tenant, for a three-year term of February 1, 2016, to January 31, 2019. The lease indicated that the monthly rent of $6500 "shall be paid to Juan Jaime or Maria Jaime." The lease was executed on February 9, 2016, and signed by Juan Jaime, as owner of La Hacienda De Las Americas, Inc. (the landlord) and Amber Duffy (the tenant).

¶ 37 According to defendant, the three subleases the plaintiff and/or his businesses executed with third parties for the La Hacienda and Supermercado spaces were not discovered by defendant until the pendency of this litigation. On September 28, 2016, defendant filed a counterclaim, which he subsequently amended, requesting a declaratory judgment that the option was not valid due to plaintiff's breach and for damages based on various specified alleged breaches of contract by plaintiff. On November 17, 2016, the circuit court entered an order indicating "[p]arties agree that defendant shall have possession of 10 Ohio Street, Joliet [the Supermercado space] *instanter*."

¶ 38    On March 9, 2017, plaintiff filed an amended complaint. In counts I and II of the amended complaint, plaintiff sought recission of the sales agreement for the shopping center, alleging a unilateral mistake that additional rent would not be collected (count I) and alleging fraud in that defendant never intended to honor the option agreement and never informed plaintiff of his intent to charge the additional rent (count II). In count III, plaintiff sought specific performance of the original option agreement. In count IV, plaintiff sought specific performance of the option agreement under the September addendum.

¶ 39    On April 19, 2017, defendant filed an amended motion to vacate, modify, and clarify the circuit court's order of December 17, 2015. Defendant requested summary judgment on his declaratory judgment claim, arguing the option agreement was breached and, thus, was not valid. Defendant also requested he be allowed to commence evictions and negotiate leases. He additionaly requested plaintiff be found in default of the holdover provisions of the Supermercado and La Hacienda leases that had expired on August 31, 2015, and in default for failing to pay rent. Defendant further requested that plaintiff's complaint for specific performance be dismissed with prejudice.

¶ 40    In response to defendant's motion, plaintiff argued that the basis of his complaint for specific performance was that he had paid all sums due under the parties' option agreement and defendant was required to convey the property to him but refused to do so on the sole basis that plaintiff had not paid the total amount due to exercise the option. Plaintiff noted that upon exercising the option, defendant was to convey the property by August 31, 2015, which was also the termination date of the leases for La Hacienda and Supermercado. Plaintiff further argued that in light of the orders entered in October and December 2015, defendant could not charge holdover rent. Plaintiff also contended that defendant had been granted possession of the

14

Supermercado space via court order on November 17, 2016, so that an eviction would be a useless act. Plaintiff requested defendant be ordered to desist in his attempt to collect holdover rent and ordered to provide an accounting of all additional rent collected as to each tenant.

¶ 41    On September 1, 2017, the circuit court denied the parties' motions, indicating that all matters were to be resolved at trial. A trial date was set for January 11, 2018.

¶ 42    On November 28, 2017, defendant filed a second amended counterclaim. In count I, defendant requested declaratory judgment against plaintiff, Three Brothers, and La Hacienda, indicating that plaintiff had breached the option/option addendum and was not entitled to specific performance, and that plaintiff, through Three Brothers and La Hacienda, had defaulted on the La Hacienda lease.

¶ 43    In count II, defendant alleged breach of contract against plaintiff, La Hacienda, and Supermercado for: (1) excess rent collected under the subleases; (2) unpaid rent, unpaid additional rent, and late fees under the La Hacienda and Supermercado leases; (3) unpaid additional rent of other tenants; (4) security deposits plaintiff failed to turn over to defendant; (5) damages related to plaintiff's alleged failure to properly maintain the property (resulting in stolen equipment, the removal of heating units and security cameras, and an inoperative elevator); and (6) damages that occurred to the Supermercado space by plaintiff's subtenant.

¶ 44    In count III defendant alleged fraud and fraudulent concealment based on plaintiff personally collecting rent from third parties in excess of the amount he was paying defendant, where plaintiff was not the owner and knowingly and with the intent to deceive, withheld such material facts from defendant to conceal the fact that the rent was being collected and to induce defendant to perform under the option agreement. Also in count III, defendant contended that he sustained damages, where GoMobile vacated the premises prior to the end of its lease as the

15

result of plaintiff verbally modifying that lease and concealing that he had done so prior to defendant purchasing the property.

¶ 45    In count IV, defendant alleged that plaintiff had breached his fiduciary duty to defendant, where plaintiff acted as manager of the property "pursuant to the Option Agreement and Addendum to Option Agreement," collected excess rent, and failed to disclose the excess rent and subleases, knowingly concealing the fact that the excess rent was being collected to keep the excess rent for himself and to induce defendant to perform under the option agreement.[3]

¶ 46    From March through August 2018, a 10-day bench trial took place, after which the circuit court requested that the parties file written closing arguments. During the trial, Ali Shalash testified that he was plaintiff's accountant for six or seven years. As plaintiff's accountant, Shalash was aware that plaintiff owned the shopping center and operated two businesses within the shopping center. On July 28, 2014, Shalash purchased the Supermercado grocery store business with fixtures (no real estate) from plaintiff and plaintiff's wife, Maria, for $40,000. Shalash made the purchase on behalf of his own business—Supermercado La Hacienda of Joliet, Inc. At that same time, Shalash entered into a lease with plaintiff for the Supermercado space for $4000 per month for a five-year lease term. The landlord was listed as Three Brothers Investment, LLC, with payments to made payable to Juan and Maria Jaime. Prior to Shalash executing the lease, plaintiff gave Shalash the impression that he still owned the shopping center. Plaintiff did not mention defendant owned the shopping center. About a year later, Shalash began to hear rumors that plaintiff and his wife were going to lose the property and, eventually, discovered there was pending litigation involving the shopping center. Shalash testified that he

_____

[3] There was no indication that defendant served Three Brothers, La Hacienda, or Supermercado with the counterclaim or amended counterclaim. Three Brothers eventually entered its appearance.

16

had paid rent to plaintiff personally (and did not make payments to Three Brothers) in the amount of $4000 per month, from August 2014, until February 2016 (18 months). He stopped making rent payments until plaintiff could prove that Shalash's lease was valid. When defendant discovered Shalash's lease with plaintiff, defendant requested $11,500 per month in rent, which Shalash did not agree to pay. Instead, Shalash vacated the premises (or was evicted by defendant) in September of 2016.

¶ 47        Duffy testified that she paid $6500 per month in rent to plaintiff for the La Hacienda space from February 2016 until the locks were changed by plaintiff on or about January 22, 2017 (11 months). Plaintiff told Duffy that he was the owner of the banquet hall and told her that the rent payments should be made payable to him, personally. Plaintiff never mentioned defendant. According to Duffy, defendant had attempted to contact her approximately six months into her lease but plaintiff and plaintiff's wife, Maria, told her not to worry about defendant and that he was nobody. Duffy continued to ignore defendant. Duffy testified that she did not pay any additional rent to plaintiff, but on one occasion plaintiff had required her to make an additional payment for a liquor license fee, insurance, and/or real estate taxes (she was not sure). Duffy testified that she subleased a portion of the banquet hall space for a Zumba exercise classes for which her company received $500 per month for three months. When she left in January 2017 she believed the Zumba entity continued to sublease the space.

¶ 48        In his closing argument brief, plaintiff argued that the evidence showed that prior to the sale of the property from him to defendant, defendant knew that tenants had not previously been charged additional rent by plaintiff and defendant knew that plaintiff could not afford to pay any additional rent if it were charged. Plaintiff contended that defendant's intent was not to reconvey the property back to him, so that defendant thwarted and destroyed plaintiff's ability to exercise

17

the option. Plaintiff claimed defendant had been over collecting additional rent and defendant's refusal to allow plaintiff to exercise the option when plaintiff paid defendant $12,310 to do so was wrongful. Plaintiff argued that defendant should not profit from his wrongful conduct of refusing to honor the option agreement based upon later learned information (learning of plaintiff's fraudulent subleases during the pendency of this litigation). Plaintiff argued that the additional rent provision of the leases was ambiguous and that parole evidence indicated that the parties had intended for defendant to pay the taxes from the tenants' base rent rather than defendant charging additional to do so. Plaintiff argued that the subleases should not terminate the parties' option agreement.

¶ 49        In his brief, in relation to contract damages, defendant stated he was seeking all damages under the Supermercado and La Hacienda leases—unpaid rent (base rent, additional rent, and holdover rent) and late fees—and $15,000 for a destroyed heating unit in the Supermercado space, which amounted to $164,429.20. Defendant also sought damages for the unpaid additional rent of other tenants and for security deposits held by plaintiff in the amount of $44,588.54. In addition, defendant sought damages for "the rents Jaime charged to Jasso, Duffy, and Shalash, and the Zumba business," with defendant requesting a total amount of $708,000—the face value of each lease if the subtenants had paid for the full term of each lease. Defendant additionally sought $10,000 for damages to the security camera at the Supermercado. Defendant requested a total of $927,017.71 and an order of possession under the Supermercado and La Hacienda leases.

¶ 50        As for his fraud claim, defendant noted that the evidence showed that plaintiff intentionally concealed the status of the Jasso, Duffy, and Shalash leases and pocketed all the rents for himself. Defendant also noted that plaintiff had falsely told Shalash and Duffy that he was the owner of the shopping center and told Duffy to ignore defendant's attempts to contact

18

her. Defendant indicated that the damages consisted of at least the amount of money paid by Jasso, Duffy, Shalash, and the Zumba tenants. Defendant also requested attorney fees and punitive damages "to compensate for [plaintiff]'s deceptive conduct." In relation to his claim that plaintiff breached his fiduciary duty of loyalty to defendant as the property manager, defendant requested damages for all lease payments paid by Jasso, Duffy, Shalash, and the Zumba tenant. Defendant also requested attorney fees and punitive damages "based on the deceptive and intentional nature of [plaintiff]'s conduct, particularly given his role as manager of a shopping center whose owner relied on him while he lived out of state."

¶ 51 In response, plaintiff argued, among other things, that defendant's claim for holdover rent for over $20,000 from Supermercado and late fees was unsupported because possession of that space had been turned over to defendant by court order of November 17, 2016, and the space had been vacant and in defendant's possession since that time. Plaintiff contended "for nearly two years, [defendant] has not acquired a new tenant for the Supermercado space," so any loss of revenue for this space was of defendant's doing.

¶ 52 On November 13, 2018, the circuit court entered a judgment in favor of defendant and against plaintiff on both plaintiff's complaint and defendant's second amended counterclaim. Specifically, the circuit court made the following findings: (1) the option agreement and September addendum were valid and enforceable; (2) defendant did not breach the option agreement or the September addendum; (3) plaintiff and Three Brothers breached non-assignment clauses and failed to pay additional rent; (4) La Hacienda and Supermercado were liable under their leases for violating the non-assignment clauses; (5) plaintiff, La Hacienda, Supermercado, and Three Brothers "acted intentionally, in bad faith, and with malice"; and (6) plaintiff "committed various acts of misconduct," including holding himself out as a property

19

owner while renting out space that he did not own and keeping the rental income therefrom, collecting rents from other tenants and pocketing some of the proceeds, entering into fraudulent leases, failing to fully pay rent under his leases, and failing to turn over security deposits held by him. The circuit court also found that defendant was credible and plaintiff's testimony "was not at all credible." Regarding counts I through IV of plaintiff's amended complaint, the circuit court found defendant not liable.

¶ 53    Regarding count I of defendant's second amended counterclaim for breach of contract, the circuit court found in defendant's favor and declared that plaintiff and Three Brothers were in breach of the option agreement and the addendum thereto. The circuit court further declared that the parties' option agreement had terminated prior to plaintiff's attempt to exercise the option. The circuit court also declared that plaintiff, La Hacienda, and Supermercado were in default of their respective leases. The circuit court, therefore, granted defendant exclusive possession of those premises. On count II of the second amended counterclaim for breach of contract, the circuit court found plaintiff was liable to defendant in the amount of $917,017.54. On count III for fraud, the circuit court found that plaintiff was liable to defendant in the amount of $708,000. For count IV, wherein defendant alleged that plaintiff had breached his fiduciary duties, the circuit court indicated the allegations were "essentially duplicative of count III" and, therefore, no additional monies could be awarded under count IV.

¶ 54    On December 10, 2018, plaintiff filed a motion to reconsider. On March 12, 2019, the court entered a written order on plaintiff's motion to reconsider. The circuit court indicated it had reconsidered the availability of both contract and tort remedies and noted that a double recovery for the same acts was legally prohibited. The circuit court indicated that it had awarded both contract and tort damages because plaintiff's acts of misconduct were numerous and "some were

20

tortious, some were not" and "some constituted breaches of contract but not torts." The circuit court found plaintiff's breaches of contract were "sufficiently subsumed in his fraudulent conduct and an award under both theories would indeed be improper." The trial court also reconsidered the propriety of the amount of damages award and indicated that, given its position that "a remedy for plaintiff's conduct sufficiently lies in tort," it awarded no contract damages to defendant. The circuit court revised its judgment, vacating its prior judgments against La Hacienda and Supermercado (counterdefendants) due to a lack of service of process on those two entities and dismissing claims for breach of contract against those entities with prejudice. The circuit court reiterated its finding that defendant was not liable regarding the claims set forth in plaintiff's amended complaint.

¶ 55        In regard to count I of defendant's second amended counterclaim for declaratory judgment, the circuit court indicated plaintiff and Three Brothers were in breach of the option agreement and the September addendum to the option agreement. The circuit court indicated that plaintiff's option to purchase the property had been terminated prior to his attempt to exercise the option and that plaintiff had defaulted on his lease obligations. In regard to count II for breach of contract, the circuit court found in favor of defendant. The circuit court, however, awarded no damages under count II for breach of contract "because the damages would be duplicative of those awarded [under count III for fraud]," and vacated its prior damages award on count II in the amount of $917,017.54. In regard to count III for fraud, the circuit court found that plaintiff was liable to defendant in the amount of $917,017.54 and reserved any award of punitive damages. In regard to count IV for breach of fiduciary duty, the circuit court found in favor of defendant but awarded no damages finding the damages would be duplicative of those awarded under count III. The circuit court noted that if it had awarded damages under count IV, the

21

damages would have been the same amount awarded under count III. The circuit court indicated that its rulings of November 13, 2018, "stand unless modified or vacated herein." Subsequently, on March 28, 2019, the circuit court entered an order indicating that defendant "wishes to forego his punitive damage claims, so the issue is resolved."

Plaintiff appealed.

¶ 56                                      II. ANALYSIS

¶ 57         On appeal, plaintiff argues the circuit court erred by: (1) failing to rescind the sales agreement for the sale of the shopping center to defendant; (2) failing to order specific performance under the parties' original option agreement; (3) failing to order specific performance under the parties' option agreement, as modified by the subsequent September addendums; (4) finding in favor of defendant and against plaintiff on defendant's counterclaim; and (5) its assessment of damages. Defendant argues the circuit court did not err and contends that this court should affirm the circuit court's judgment.

¶ 58                        A. Ruling on Plaintiff's Amended Complaint

¶ 59                1. Denial of Plaintiff's Request for Recission of the Sales Contract

¶ 60         Plaintiff contends the circuit court erred in not granting his request for recission of the sales agreement based on plaintiff's own unilateral mistake as to defendant's intent to charge additional rent. Plaintiff contends that a combined amount of $3170 per month for additional rent where the Supermercado and La Hacienda tenants were paying $4000 in base rent ($2000 per month each) amounted to a material mistake as it was an 85% increase in payment that would harm plaintiff's ability to obtain a loan in order exercise the option. Plaintiff asserts that it was a mistake on his part to believe that defendant would honor the parties' option agreement and, at

the same time, believes there was fraud on defendant's part where defendant did not intend to honor the option.

¶ 61    Rescission is an equitable remedy that is not given as a matter of right, but as a matter of grace that is within the court's discretion. *Luciani v. Bestor*, 106 Ill. App. 3d 878, 882 (1982). Rescission seeks to restore the parties to their precontract positions. *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 5 (2010). Upon rescission of a contract, it is as if the contract never existed in the first place. *Id.* A trial court's decision to grant or deny a request to rescind a contract is within its discretion and will not be disturbed absent an abuse of that discretion. *Id.*

¶ 62    A trial court has the discretion to grant rescission based upon a unilateral mistake when, upon clear and convincing evidence, the party seeking the rescission shows: (1) the mistake is material; (2) the mistake is so consequential that enforcement would be unconscionable; (3) the mistake occurred despite the complaining party's exercise of due care; and (4) the parties can be fully restored to the status quo by way of rescission. *Siegel v. Levy Organization Development Co.*, 153 Ill. 2d 534, 545 (1992). A mistake of fact is "not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in an unconscious ignorance or forgetfulness of a fact past or present material to the contract, or belief in the present existence of a thing material to the contract which does not exist, or in the past existence of a thing which had not existed." *Cameron v. Bogusz*, 305 Ill. App. 3d 267, 272 (1999) (quoting *Boyd v. Aetna Life Insurance Co.*, 310 Ill. App. 547, 555 (1941).

¶ 63    Here, plaintiff argues that defendant's acts of charging additional rent were fraudulent because defendant knew that additional rent was not being collected from tenants when he purchased the shopping center and did not provide plaintiff notice of his intent to do so after

23

purchasing the shopping center. However, the additional rent provisions were set forth in the leases, which were signed by plaintiff. See *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 40 ("in the absence of fraud, where a person could have read a contract and ascertained the accuracy of the documents, but neglected to do so, he may not avoid the legal consequences of the executed contract on the ground that the signing was done without knowledge of its contents."). There is nothing in the record indicating that plaintiff's claimed mistaken belief that additional rent would not be collected was anything but an assumption that was contrary to the leases' terms. Plaintiff was facing foreclosure if defendant did not purchase the shopping center and sign the documentation for defendant to do so, which included plaintiff also executing leases for his business that included additional rent provisions.

¶ 64　　　　Moreover, even if an issue had initially arisen regarding the parties' understanding in relation to the payment of additional rent, the September addendums to the leases made clear that additional rent was to be paid on a monthly basis. See *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 165 (2004) (a person seeking to rescind a transaction on the basis of fraud or misrepresentation must do so promptly; an unreasonable delay in taking the necessary steps to set aside a fraudulent contract will, in effect, affirm it). Furthermore, plaintiff failed to present evidence to support his contention of fraud related to any alleged misrepresentation regarding the collection of additional rent where there is no indication that defendant stated or insinuated in any way that he would not be doing so in accordance with the leases' terms. See *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 165 (2004) (the equitable remedy of rescission may be granted where there was some fraud in the making of a contract).

24

¶ 65     Based on this record, it cannot be said that the trial court abused its discretion in denying plaintiff's request for rescission of the sales contract.

¶ 66                    2. Denial of Specific Performance of the Option

¶ 67     Next on appeal, plaintiff argues that the circuit court erred in denying his request for specific performance of the original option agreement and, alternatively, under the option agreement as modified by the September addendum.

¶ 68                         a. Validity of the Option Addendum

¶ 69     Plaintiff contends specific performance under the original option agreement is warranted because the option addendum was not valid and enforceable due to duress and a lack of consideration. Plaintiff also argues that the option addendum was unconscionable due to an inordinate disparity in bargaining power between the parties, evidenced by plaintiff only having nine years of formal education in Mexico and defendant having an undergraduate degree from MIT and graduate degrees in business administration. Plaintiff argues that because defendant was threatening eviction if plaintiff did not agree to pay additional rent and plaintiff would have to spend money to litigate the issue, which would impact plaintiff's ability to secure a loan to purchase the property, plaintiff decided to go along with paying additional rent.

¶ 70     Here, the record refutes plaintiff's contention that the modifications to the original option agreement/leases were not supported by consideration. In exchange for plaintiff executing the September addendum to the option agreement to resolve the additional rent dispute, defendant allowed plaintiff to pay past due amounts of additional rent in the amount of $10,440 without penalty or interest (if paid in full on or before October 1, 2014). Defendant also agreed to waive his right to evict plaintiff's two businesses based on the breach of contract related to the nonpayment of additional rent. In doing so, defendant forwent the opportunity to collect fair

25

market rent for the La Hacienda and Supermercado spaces and allowed plaintiff's businesses to continue paying rent at below market value.

¶ 71        Additionally, we find no merit in plaintiff's contention that the purported disparity in the parties' education and business acumen and plaintiff having acted under economic duress rendered the September addendum unconscionable. The determination of whether a contract or a portion of a contract is unconscionable is a question of law, which we review *de novo*. *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 22 (2006). A trial court may make a finding of unconscionability based on procedural unconscionability, substantive unconscionability, or a combination thereof. *Id.* at 21. "Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Id.* at 23 (quoting *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 989 (1980)). Substantive unconscionability is implicated where the terms of a contract are "so inordinately one-sided as to oppress or unfairly surprise an innocent party." *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 95. The issue of unconscionability should be reviewed in reference to the totality of the circumstances surrounding the transaction. *Id.* Where the question of unconscionability turns on a question of fact, the manifest weight of the evidence standard is appliable. *In re Marriage of Tabassum and Younis*, 377 Ill. App. 3d 761, 777 (2007).

¶ 72        "Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will, and a contract executed under duress is voidable." *Alexander v. Standard Oil Co.*, 97 Ill. App. 3d 809, 814-15 (1981). To establish duress, one must demonstrate that the threat has left the individual "bereft of the quality of mind essential to the making of a contract." *Id.* (quoting *Kaplan v. Kaplan*, 25 Ill. 2d 181, 186 (1962)). The acts or threats complained of by the plaintiff must be wrongful acts,

which include not only acts that are criminal, tortious, or in violation of a contractual duty but also acts that are wrongful in a moral sense. *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 91 (1999). Where consent to an agreement is secured through a lawful demand or upon doing or threatening to do that which a party has a legal right to do, economic duress is not present. *Id.* at 91. Nor is duress present where consent to an agreement is secured as the result of hard bargaining or the pressure of financial circumstances. *Id*; *Alexander*, 97 Ill. App. 3d at 815. The acts of the party with the alleged advantage must have been tainted with fraud or wrongdoing for an agreement to be invalidated based on duress. *Alexander*, 97 Ill. App. 3d at 815.

¶ 73        In this case, the circuit court's finding that the option agreement and September addendums were valid and enforceable was not against the manifest weight of the evidence. In settling the dispute regarding unpaid additional rent from June through September, the parties executed September addendums to the option agreement and to the Supermercado and La Hacienda leases. There is no indication that plaintiff attempted to negotiate any other terms to the September addendums or that he was unaware of or misunderstood any of the terms. A disparity in bargaining power alone will not render a contract term unenforceable. See *McClure Engineering Associates, Inc. v. Reuben Donnelley Corp.*, 101 Ill. App. 3d 1109, 1112 (1981). Additionally, although plaintiff was facing eviction, the threat of eviction was created by plaintiff's nonpayment of additional rent in breach of the Supermercado and La Hacienda leases and cannot be said to be a wrongful act of defendant. See *Alexander*, 97 Ill. App. 3d at 814-15. Consequently, the circuit court did not err in denying plaintiff's request for specific enforcement of the original option agreement, where the subsequent addendum to the option agreement was valid and enforceable.

¶ 74                    b. Denial of Specific Performance of Option with the Addendum

¶ 75           Plaintiff also contends specific performance of the option with addendum was warranted

because he completely complied with the option agreement as amended, where defendant

informed plaintiff what the option payment had to be, and he paid it. Plaintiff argues that, in

compliance with the terms of the option agreement, he paid the $50,000 option fee, gave notice

of his intent to exercise the option by February 28, 2015, and secured a loan and was ready,

willing, and able to purchase the property. In response, defendant argues that the circuit court's

findings of plaintiff's breaches of the leases and of the option/option addendum, which resulted

in the termination of the option, was supported by the evidence.

¶ 76           "Specific performance is an equitable remedy requiring a defendant to perform an

affirmative act in order to fulfill a contract." *Dixon v. City of Monticello*, 223 Ill. App. 3d 549,

560 (1991). In general, contracts for the convenance of real estate are often enforced by specific

performance because there is no adequate remedy at law. *Id*. at 561. A claim of specific

performance requires: (1) a valid, binding, enforceable contract; (2) the claimant's compliance

with the terms of the contract, or the fact that he or she is ready, willing, and able to perform his

part of the contract; and (3) the opposing party's failure or refusal to perform his or her part

under the contract. *McCormick Road Associates L.P.II v. Taub*, 276 Ill. App. 3d 780, 783 (1995).

Specific performance is not generally available as a matter of right. *Daniels v. Anderson*, 162 Ill.

2d 47, 56 (1994). Rather, the remedy of specific performance rests within the sound discretion of

the trial court, based on all facts and circumstances in evidence. *Id*.

¶ 77           The record shows that in addition to the lease terms prohibiting an assignment of the

leases, the leases' initial addendums (signed the same day as the leases) specifically prohibited

the leases from being assigned for any reason and indicated that if a new entity sought to occupy

28

the premises, "a new lease at fair market rent shall be required." The September option addendum indicated that any changes to the leases "shall be in writing" and signed by both plaintiff and defendant. The addendums to the leases and the option agreement specifically indicated that a default under the Supermercado lease, the La Hacienda lease, the option, or the addendums would act to automatically terminate the parties' option agreement. In clear violation thereof, the Supermercado and La Hacienda spaces were leased to third parties for rent amounts higher than the below-market rent that was being paid by plaintiff to defendant. The clear language of the parties' agreements demonstrates that it was the parties' intent for defendant to receive the benefit of any higher rents charged to third parties and prohibited plaintiff from pocketing any excess rent money for himself.

¶ 78 Here, the circuit court's findings that plaintiff failed to comply with the terms of the leases, which thereby terminated the option, was not against the manifest weight of the evidence. *Cf. Artful Dodger Pub, Inc. v. Koch*, 230 Ill. App. 3d 806, 811 (1992) (when an option is exercised in accordance with its terms, it becomes a present contract for the sale of the property; the former lessor/lessee relationship terminates, the parties occupy the relationship of vendor/vendee, the property is regarded, in equity, as that of the vendee, and, in general, the lessor is not entitled to rent thereafter). Given the circuit court's finding that the option/option addendum was no longer valid at the time of plaintiff's attempt to exercise the option, the circuit court did not abuse its discretion in denying plaintiff's request for the equitable remedy of specific performance of the option/option addendum.

¶ 79 B. Ruling on Defendant's Second Amended Counterclaim

¶ 80 Next, plaintiff argues the trial court erred in entering judgment against him and in favor of defendant on defendant's second amended counterclaim. The standard of review applied to a

29

circuit court's decision following a bench trial is to determine if the judgment was based on facts that are against the manifest weight of the evidence. *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59. "The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Id*. A judgment is against the manifest weight of the evidence where the opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not based on the evidence. *Cincinnati Insurance Co. v. Pritchett*, 2018 IL App (3d) 170577, ¶ 16.

¶ 81    In count I of the second amended counterclaim, defendant/counterplaintiff sought a declaration from the circuit court that the option had been terminated in light of plaintiff/counterdefendant's breach of the option agreement/option addendum due to a default on the La Hacienda and Supermercado leases. The circuit court found in favor of defendant and against plaintiff, declaring that plaintiff and Three Brothers were in breach of the option agreement/September addendum and plaintiff's option had, therefore, terminated prior to plaintiff attempting to exercise the option to repurchase the property from defendant.

¶ 82    Declaratory relief is equitable in nature and requires that the party seeking relief has a legally tangible interest, that the defendant has an opposing interest, and there is an actual controversy between the parties in relation to those interests. *Veazey v. Board of Education of Rich Township High School District 227*, 2016 IL App (1st) 151795, ¶ 33. An actual controversy requires that the underlying facts and issues of the case are not moot or premature so as to require a judgment on mere abstract propositions of law, an advisory opinion, or legal advice pertaining to future events. *Id.* The initial requirement for a declaratory judgment claim is establishing that the plaintiff "can plead a legal theory in which he has a personal legal interest."

30

*Id.* (quoting *Gore v. Indiana Insurance Co.*, 376 Ill. App. 3d 282, 291 (2007)). In general, a decision to grant or deny a declaratory judgment is reviewed for an abuse of discretion. *State Farm Mutual Automobile Insurance Co. v. Leon*, 2019 IL App (1st) 180655, ¶ 26. An abuse of discretion takes place where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 83        Here, defendant had an interest in determining whether the option had been terminated, while plaintiff had an opposing interest in pursuing his rights under the option. The trial court settled the controversy between the parties by declaring that plaintiff was not entitled to specific performance of the option agreement due to a breach of the leases that resulted in the termination of the option. The circuit court's findings that the leases were breached were not against the manifest weight of the evidence, and we cannot say the circuit court abused its discretion in granting the declaratory relief.

¶ 84        In relation to defendant's breach of contract claim, plaintiff argues that he could not have breached the leases by not paying additional rent or assigning leases where his business entities, La Hacienda and Supermercado (and not himself/Three Brothers) were the parties to those leases. He argues that neither he nor Three Brothers could violate an agreement to which they were not parties. Under the September option addendum, plaintiff had specifically acknowledged that his businesses had leases with defendant under his business entities and that he was the principal of both those entities. He also agreed that a default of those leases, a default of the option agreement, or a default of the September addendum would automatically terminate the option. The fact that plaintiff, individually, was not a party to the leases/subleases of his business entities is of no consequence in determining whether those leases had, in fact, been breached. Moreover, plaintiff does not contend that he lacked the authority to act on behalf of his

31

businesses—Supermercado, La Hacienda, and Three Brothers. Thus, the circuit court's finding that the Supermercado and La Hacienda leases were breached was not against the manifest weight of the evidence.

¶ 85    Plaintiff additionally argues the circuit court erred in finding he committed fraud. Plaintiff contends that defendant's theory of fraud based on an intentional concealment of the subleases was a legal theory not recognized by Illinois Courts. Plaintiff contends that a breach of contract does not become a tort simply because the breach was willful and wanton. Under the economic loss rule or *Moorman* doctrine, a plaintiff cannot recover in tort for a solely economic loss under tort theories of strict liability, negligence, and negligent misrepresentation. *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 91 (1982). However, an exception to the *Moorman* doctrine exists where plaintiff's damages are proximately caused by an intentional misrepresentation. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 199 (1997). Consequently, the circuit court did not err in addressing defendant's contentions of plaintiff's fraudulent conduct in relation to the unauthorized subleases.

¶ 86    Our review of the record indicates no error in the trial court's finding that plaintiff committed fraud or that plaintiff breached his fiduciary duty. Plaintiff, who managed the property locally for the out-of-state defendant, intentionally and actively concealed the third-party leases from defendant, telling the subtenants he owned the premises and to make payments directly to him, and kept the excess rent for himself. See *Board of Education of City of Chicago v. A, C and S, Inc.*, 131 Ill. 2d 428, 452 (1989) (elements of fraudulent misrepresentation are: (1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance); *Schrager v.*

32

*North Community Bank*, 328 Ill. App. 3d 696, 703 (2002) (to prove concealment of a fact was a fraudulent misrepresentation, it must be shown: (1) there was concealment of a material fact; (2) the concealment was intended to induce a false belief under circumstances creating a duty to speak; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from doing so, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) the reliance by the person from whom the fact was concealed led to his injury).

¶ 87　　　　Additionally, plaintiff had a fiduciary duty to defendant and breached that duty. Elements for a claim for breach of fiduciary duty are that: (1) a fiduciary duty existed; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the party complains. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. "A fiduciary relationship and the attendant duties can arise as the result of the special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former." *Garrick v. Mesirow Financial Holdings, Inc.*, 2013 IL App (1st) 122228, ¶ 32. Here, plaintiff managed the property for the out-of-state defendant and dealt with the tenants, with whom plaintiff had preexisting long-standing relationships. Further, plaintiff collected funds on behalf of defendant (security deposits and rent payments). Based on the circumstances of this case, a fiduciary relationship existed, and the trial court did not err in finding plaintiff breached his fiduciary duties to defendant.

¶ 88　　　　　　　　　　　　　　　　C. Damages

¶ 89　　　　As for damages, the circuit court entered a judgment against plaintiff and in favor of defendant in the amount of $917,017.54. As discussed above, the circuit court's monetary award

33

was entered under defendant's fraud claim, with the circuit court finding plaintiff's breaches of contract were "sufficiently subsumed in his fraudulent conduct." The circuit court did not award additional damages pursuant to defendant's breach of fiduciary duty claim, concluding that damages under both theories (fraud and breach of fiduciary duty) would be improperly duplicative. No punitive damages were awarded because defendant "wishe[d] to forego his punitive damage claim."

¶ 90        The determination of damages by a trial court sitting without a jury will not be set aside unless it is manifestly erroneous. *First National Bank and Trust Co. of Evanston v. J.P. Schermerhorn and Co., Inc.*, 192 Ill. App. 3d 1057, 1062 (1989). Absolute certainty is not required for an award of damages. *Id*. Rather, all that is required is an adequate basis in the record for the court's determination. *Id*. We acknowledge and agree with the circuit court that "[f]or one injury there should only be one recovery irrespective of the availability of multiple remedies and actions." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 422 (2002) (barring double recovery of damages pursuant to claims brought under federal and state statutes); *SJS Investments, Ltd. v. 450 East Partnership*, 232 Ill. App. 3d 429, 433 (1992) (a plaintiff electing the return of its earnest money under a real estate contract could not also obtain specific performance of that contract).

¶ 91        Contract damages are to be awarded in accordance with the parties' agreement or, if silent, in accordance with contract law. See *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill. App. 3d 338, 349-51 (1980) (a plaintiff who has a remedy for breach of contract cannot recover under tort law that which he may or may not be entitled to recover under the contract or under contract law). "The purpose of [contract] damages is to place the nonbreaching party in a position that he or she would have been in had the contract been performed, *not to provide the*

34

*nonbreaching party with a windfall recovery*." (Emphasis in original.) *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277, 296 (2009) (quoting *Jones v. Hryn Development, Inc.*, 334 Ill. App. 3d 413, 418 (2002)). When parties dealing at arms-length enter a contract, the law allows them, within reasonable limits, to shape the terms of the contract as they please. *Album Graphics*, 87 Ill. App. 3d at 349-51. While the law does not condone breach of contract, it does not consider it tortious or wrongful. *Id.* A party may breach a contract purposely if he is willing to put the other party in the position that he would have been had the contract been fully performed. *Id.* Fault is irrelevant to breach of contract. *Id.* Regardless of whether one intentionally, carelessly, or innocently breaches a contract, it is still considered a breach of the contract and the extent of the breaching party's liability is generally the same. *Id.*

¶ 92       On the other hand, tort law is based on fault (with the exception of strict liability) and a person's conduct may be considered to be wrongful. *Id.* The extent of liability may depend on the degree of fault—intentional misconduct may give rise to greater liability than negligent conduct, especially considering the possibility of punitive damages. *Id.* In an action for fraud, damages may not be predicated on mere speculation, and must be a proximate, and not remote, consequence of the fraud. *Brown v. Broadway Perryville Lumber Co.*, 156 Ill. App. 3d 16, 25 (1987). "Generally, the measure of damages for fraud is such an amount as will compensate the plaintiff for the loss occasioned by the fraud, or the amount which plaintiff is actually out of pocket by reason of the transaction." *Id.*

¶ 93                          1. Damages of $708,000 for Unauthorized Subleases

¶ 94       Plaintiff first takes issue with the $708,000 in damages that defendant sought for the face value of the subleases, noting that defendant failed to cite any case law in support of such damages and that no contract term provided for such damages. Plaintiff further notes that none of

35

the tenants made monthly payments for the entire term of the leases. He contends the evidence showed that Jasso, Duffy, and Shalash had paid a total of $274,000 in rent under the unauthorized subleases and that, according to defendant's own exhibits, plaintiff's businesses (Supermercado and La Hacienda) had paid defendant approximately $213,000 during that same time period, leaving only about $61,000 in excess rent. We agree that the trial court erred in awarding $708,000 in damages for the unauthorized subleases.

¶ 95 The award of $708,000 reflects the face value of the leases—the total rent that would have been paid to plaintiff if the subtenants had remained in the property and paid plaintiff for the full term of their improper leases. In requesting $708,000 in damages related to the improper subleases, defendant had asserted the following: (1) Jasso with a three-year lease term at $6000 per month—$216,000; (2) Amber Duffy with a three-year lease term at $6500 per month—$234,000; (3) Ali Shalash with a five-year lease term at $4000 per month—$240,000; and (4) Zumba assume [$]500/month for 3 years—$18,000. However, the evidence indicates that Jasso's lease was from June 15, 2014, to June 14, 2017, for the La Hacienda space, but Duffy was subleasing that space as of February 2, 2016. Thus, the evidence is clear that Jasso did not pay for the full term of his lease. The evidence also indicated that Duffy only paid for 11 months of her three-year lease. The evidence additionally showed that the Zumba entity paid Duffy, not plaintiff, for at least the initial three months it was using the La Hacienda space. The evidence further showed that while Shalash's five-year sublease for the Supermercado space was for the term of August 1, 2014, to July 31, 2019, he left/was evicted in September 2016 after defendant discovered the sublease and attempted to raise the rent from $4000 per month to $11,500 per month. Additionally, the $708,000 awarded for the unauthorized subleases failed to account for

any rent and additional rent that plaintiff had, in fact, paid to defendant under the Supermercado and La Hacienda leases.

¶ 96 Specifically in reference to contract damages, plaintiff is correct that the leases did not specify damages for plaintiff entering into a prohibited sublease. However, the language of the parties' agreements made it clear that it was the intent of the parties for defendant (not plaintiff) to benefit from any increase in rent payments resulting from new tenants occupying the Supermercado and La Hacienda spaces and that plaintiff was not to profit from the below-market rent he was being charged by subleasing those spaces to third parties. Had the contract been performed, new leases would have been executed with defendant as the landlord and defendant, not plaintiff, would have received the increased rent payments. Thus, the circuit court found that formulating a contract damage award in relation to excess rent collected by plaintiff under the unauthorized subleases was not erroneous based on the facts and circumstances of this case. See *Federal Insurance Co.*, 393 Ill. App. 3d at 296.

¶ 97 Nevertheless, there is no support in the record for an award of $708,000 for contract damages related to the unauthorized subleases where, among other things, no subtenant had paid rent for the entire term of their lease, two of the leases' terms overlapped because the earlier subtenant vacated the space before the expiration of his lease, and it appears defendant was in possession of the space(s) prior to expiration of the sublease(s) and did not indicate an effort to mitigate damages. Arguably defendant had a duty to mitigate his damages at some point after he was in possession of the spaces. "A landlord or his or her agent shall take reasonable measures to mitigate the damages recoverable against a defaulting lessee." See 735 ILCS 5/9-213.1 (West 2022). A landlord has the burden of proving its compliance with the statutory duty of mitigation. *Danada Square, LLC v. KFC National Management Co.*, 392 Ill. App. 3d 598, 608 (2009). The

37

question of whether a landlord has met its statutory duty to mitigate damages is, generally, a question of fact. *Id.* at 607.

¶ 98    Thus, the award of $708,000 for contract damages related to the prohibited subleases was speculative and erroneously provided defendant with a windfall recovery. See *Federal Insurance Co.*, 393 Ill. App. 3d at 296. Similarly, the $708,000 awarded for fraud damages for plaintiff's acts of secretly entering into the subleases was erroneous in that it overcompensated defendant for his losses stemming from the fraud. See *Brown*, 156 Ill. App. 3d at 25. Awarding $708,000 for the face value of the third-party leases was against the manifest weight of the evidence in that the amount was unreasonable, arbitrary, and not based on the evidence. See *Pritchett*, 2018 IL App (3d) 170577, ¶ 16. We, therefore, vacate the circuit court's contract/fraud award of $708,000 in favor of defendant in relation to the prohibited subleases and remand to the circuit court to recalculate the award after making factual findings in relation thereto.

¶ 99    2. Additional Damages Awarded in the Amount of $209,017.54

¶ 100    Here, the trial court found in favor of defendant on count II of defendant's second amended counterclaim for breach of contract but awarded no contract damages, reasoning the damages would be "duplicative" of damages awarded under the fraud count. However, it appears that defendant's contentions in support of these additional damages were based solely on claims of breach of contract that could not be subsumed into defendant's fraud claim—claims for shortages of base rent, additional rent, holdover rent, late fees, additional rent owed by other tenants to be paid by plaintiff under the option agreement, and security deposits to be returned by plaintiff as per the option agreement. Yet, the circuit court found that plaintiff's breaches of contract were "sufficiently subsumed in his fraudulent conduct" and that a remedy for plaintiff's conduct "sufficiently lies in tort." The circuit court, therefore, erred by awarding no contract

38

damages to defendant and, instead, concluding all contract damages were subsumed into the fraud award.

¶ 101        In determining that it need not award contract damages, the circuit court indicated that it, consequently, need not address plaintiff's arguments that he could not be personally liable for breaches of contract committed in the names of his entities. Plaintiff argues an award of contract damages cannot be entered against him personally because any such judgment should be against his entities, Supermercado and La Hacienda, who were the parties to the leases. However, the circuit court did not have jurisdiction over the two companies (due to those entities not being served with defendant's second amended counterclaim), and plaintiff argues that any judgment against the companies would be void. Plaintiff contends the circuit court did not pierce the corporate veil and, therefore, should not have entered judgment against him. It appears the issue of a lack of piercing of the corporate veil was not raised by plaintiff in any motion before or during trial and is, therefore, waived. Notwithstanding the waiver, the record supports a judgment against plaintiff, personally, for breach of the Supermercado/La Hacienda leases.

¶ 102        A corporation is a legal entity separate and distinct from its officers and shareholders who, as a general rule, are not liable for the obligations of the corporation. *Gallagher v. Reconco Builders, Inc.*, 91 Ill. App. 3d 999, 1004 (1980). However, a court can disregard a corporate entity and find the corporate veil pierced where the corporation is merely the alter ego of a dominant personality. *Id.* "Piercing the corporate veil is not a cause of action but, rather, a means of imposing liability in an underlying cause of action." *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 9. The corporate veil can be pierced when there is a "unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist: and second,

39

circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote an injustice." *Gallagher*, 91 Ill. App. 3d at 1004.

¶ 103　　　　In the case at bar, defendant's second amended counterclaim alleged and the evidence established a plethora of facts supporting the judgment against plaintiff and piercing of the corporate veil. Plaintiff was the owner, and he and his wife were the only two people associated with the two companies. Plaintiff signed the original two leases with defendant, with no reference to his position with the companies. Plaintiff signed the September option addendum, which clarified and/or comingled the terms of the two leases with the terms of the separate option agreement, in his individual capacity. Most importantly, plaintiff was the manager of the property, plaintiff secretly entered subleases for the two businesses at a significantly higher rent than he was obligated to pay to defendant, plaintiff actively concealed such subleases from defendant, and the excess funds were kept by Jaime or his other entity, Three Brothers. Thus, the trial court found plaintiff liable for fraud. Although there are other factors a court can consider in determining whether a corporate entity should be disregarded, the record in this case clearly supports the court's imposition of a judgment against plaintiff and adherence to the fiction of separate corporations would sanction a fraud and promote an injustice. See *Fentress v. Triple Mining, Inc.*, 261 Ill. App. 3d 930, 938 (1994) (corporation undercapitalized, failed to adhere to corporate formalities, and officers sought repayment from a partner in their individual capacity). Thus, an award of contract damages against plaintiff, personally, would be appropriate under the facts and circumstances of this case.

¶ 104　　　　However, the circuit court did not make specific findings related to the defendant's breach of contract claims. We therefore remand for the circuit court to do so in recalculating the award of damages in this case. We note that on remand defendant cannot be awarded the

40

$36,788.54 in contract damages he claimed for a breach of the parties' option/option addendum for unpaid additional rent of other tenants where the option terminated. Although plaintiff agreed to pay the unpaid additional rent of the other tenants at the time of exercising the option to purchase the shopping center, the circuit court found that the option/option addendum had terminated prior to plaintiff exercising the option. There is no indication under the terms of the option/option addendum that the parties had intended for plaintiff to be responsible for any unpaid additional rent of the other tenants outside the scenario of plaintiff exercising the option to purchase the property. As a result of the option terminating, plaintiff could not exercise the option and defendant retained plaintiff's $50,000 option fee and ownership of the shopping center. Defendant was also not entitled to unpaid additional rent of other tenants from plaintiff upon termination of the option. Therefore, any award of contract damages related to unpaid additional rent of other tenants was erroneous.

¶ 105        Consequently, we affirm the circuit court's finding related to the merits of the claims asserted in plaintiff's amended complaint and defendant's second amended counterclaim but vacate the monetary award of $917,017.54 granted in favor of defendant and remand for further proceedings. On remand, we instruct the trial court to make specific findings as to plaintiff's alleged breaches of contract and determine the appropriate measure of contract damages related thereto (shortages of base rent, additional rent, holdover rent, late fees, and security deposits to be returned by plaintiff). Additionally, the circuit court should reevaluate the proper amount of damages to be awarded in relation to defendant's fraud and breach of fiduciary duty claims and make findings based on the evidence (considering funds actually received by plaintiff from the unauthorized fraudulent leases minus the rents plaintiff paid to defendant for base rent and additional rent for those spaces during the relevant time period). See *Brown*, 156 Ill. App. 3d at

41

25. In so awarding damages on remand, the circuit court should continue to prevent any double recovery for the same injury. See *Robinson*, 201 Ill. 2d at 422.

¶ 106                                    III. CONCLUSION

¶ 107          The judgment of the circuit court of Will County is affirmed in part and vacated in part. This cause is remanded for further proceedings.

¶ 108          Affirmed in part and vacated in part.
               Cause remanded.